**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT**
**EASTERN DIVISION**

SHAWN P. KELLY             )
                              )
             Plaintiff,       )
                              )
             v.             )      Case No. 10 C 4229
                              )
THE McGRAW-HILL COMPANIES,   )
INC., a New York corporation,      )
                              )
             Defendant.     )

**MEMORANDUM OPINION AND ORDER**

Shawn Kelly ("Kelly") has sued McGraw-Hill Companies, Inc. ("McGraw"), where Kelly worked as an independent sales representative, asserting a host of theories of recovery: breach of, and interference with, the most recent two-year Sales Representative Agreement between them (the "2008 Sales Agreement") (Count I); failure to pay commissions on 2010 orders for which Kelly was allegedly the procuring cause during the term of the 2008 Sales Agreement (Count II); exemplary damages under the Illinois Sales Representative Act (the "Sales Act") of treble the amount of certain commissions that may be found due Kelly (Counts III and IX); accounting (Count IV); fraud (Count V); reimbursement of certain expenses (Count VI); unjust enrichment (Counts VII and X); and breach of an agreement to reimburse certain expenses (the "Chargeback Agreement") (Count VIII). This Court has earlier dismissed Count II.

McGraw has now filed a motion targeting Kelly's contentions of fraud (under Count V), unjust enrichment (under Count VII), interference (under Count I), exemplary damages (under Count III) and breach of the Chargeback Agreement (under Count VIII) – a motion that it labels (incorrectly in this Court's view) as one seeking partial summary judgment under Fed. R. Civ. P.

("Rule") 56.[1]  In response Kelly has withdrawn his Count V fraud assertion and his Count VII

unjust enrichment assertions, and the parties have proceeded in accordance with this District

Court's LR 56.1 on Counts I, III and VIII.[2]  For the reasons stated here, McGraw's motion is

granted in its entirety (though not in terms of judgments under Rule 56), and for reasons also

dealt with hereafter Counts III and X are dismissed as well.

## Summary Judgment Standard

Every Rule 56 movant bears the burden of establishing the absence of any genuine issue

of material fact (Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)).[3]  For that purpose

courts consider the entire evidentiary record and must view all of the evidence and draw all

---

[1] At this point in the development of Rule 56 jurisprudence, this Court (though it has no pretensions to perceive itself as a latter-day Isaiah) may well be a voice that crieth in the figurative wilderness when it periodically points out that a motion that seeks to winnow out some but not all of a plaintiff's different theories of recovery stemming from a common core of operative facts is not really a motion for partial summary judgment as Rule 56 was originally conceived.  Lawyers (perhaps as a result of practicing in state courts, where the operative concept is a "cause of action" rather than the federal "claim for relief" – see the lucid explanation in NAACP v. Am. Family Mut. Ins. Co., 978 F.2d 287, 292-93 (7th Cir. 1992)) tend to ignore the limited role prescribed for different counts in Rule 10(b).  That has in turn led to motions of the type advanced here under the purported rubric of Rule 56, rather than as issue-narrowing motions under Rule 16.  That said, however, this opinion will adhere to the litigants' suspect terminology, if only to avoid confusion.

[2] LR 56.1 requires parties to submit evidentiary statements and responses to such statements to highlight which facts are disputed and which facts are agreed upon.  This opinion cites to McGraw's LR 56.1 statement as "M. St. ¶--," to Kelly's LR 56.1 statement as "K. St. ¶--" and to the parties' respective responses as "M. Resp. ¶--" and "K. Resp. ¶--."  Where a response does not provide a version of the facts different from the original statement, this opinion cites only that original statement.  Citations to McGraw's and Kelly's memoranda take the forms "M. Mem. --" and "K. Mem. --" respectively, and citations to McGraw's reply memorandum take the form "M. R. Mem. --."

[3] At the summary judgment stage, of course, nonmovant Kelly need not "establish" or "show" or "prove" anything, but must merely demonstrate that a genuine issue of material fact exists.  This opinion's later employment of those quoted terms is due to the cited cases' use of that terminology, but this Court imposes on Kelly the lesser burden described earlier in this footnote.

inferences from that evidence in the light most favorable to nonmovants (Egan Marine Corp. v.

Great Am. Ins. Co. of N.Y., 665 F.3d 800, 811 (7th Cir. 2011)).  But a nonmovant must produce

more than "a mere scintilla of evidence" to support the position that a genuine issue of material

fact exists and "must come forward with specific facts demonstrating that there is a genuine issue

for trial" (Carmichael v. Vill. of Palatine, Ill., 605 F.3d 451, 460 (7th Cir. 2010), quoting

Wheeler v. Lawson, 539 F.3d 629, 634 (7th Cir. 2008)).  As Payne v. Pauley, 337 F.3d 767, 772-

73 (7th Cir. 2003) has explained:

> [T]he Federal Rules of Civil procedure require the nonmoving party to "set forth
> specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P.
> 56(e).  Conclusory allegations, unsupported by specific facts, will not suffice.[4]

Ultimately summary judgment is warranted only if a reasonable jury could not return a

verdict for the nonmovant (Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  What

follows is a summary of the relevant facts, viewed of course in the light most favorable to

nonmovant Kelly.

---

[4] [Footnote by this Court] Lawyers (and regrettably judges) often lump "self-serving affidavits" into the category of submissions that are insufficient to overcome summary judgment.  That blanket assertion is incorrect.  Payne, 337 F.3d at 773 was careful to distinguish conclusory affidavits from merely self-serving ones:

> We hope this discussion lays to rest the misconception that evidence
> presented in a "self-serving" affidavit is never sufficient to thwart a
> summary judgment motion.  Provided that the evidence meets the
> usual requirements for evidence presented on summary judgment --
> including the requirements that it be based on personal knowledge and
> that it set forth specific facts showing that there is a genuine issue for
> trial -- a self-serving affidavit is an acceptable method for a non-
> moving party to present evidence of disputed material facts.

**Factual Background**

McGraw is a publisher and seller of educational books, including Everyday Math, a mathematics textbook for elementary school students (M. St. ¶1). Kelly worked as an independent sales representative for McGraw in California (id. ¶5). Before a textbook can be sold to a public elementary school in California, it must be approved by the California State Board of Education ("California Board") (id. ¶7). If a school board feels the approved textbook is appropriate for its school, it may formally adopt that textbook (id. ¶8). Typically the board will follow up with a purchase order, but in rare instances it may not purchase the book or the purchase may require a separate vote by the board (K. Resp. ¶8). In 2007 McGraw published a new edition of Everyday Math, and the California Board adopted it in large part as a result of Kelly's efforts (M. St. ¶10).

Kelly entered into a contract with McGraw (the "2006 Sales Agreement") that encompassed a term from January 1, 2006 to January 1, 2008 and entitled Kelly to receive commissions from sales of certain McGraw products in California (K. St. ¶¶1-2). McGraw was responsible for providing up to $60,000 of product samples for each year of the Agreement, while Kelly would be charged for any additional samples he required (id. ¶3). McGraw later agreed to reimburse Kelly for $50,000 in marketing expenses he incurred in 2006 (id. ¶11).

Tracie Saunders ("Saunders"), a McGraw financial analyst, was responsible for disbursing Kelly's commissions pursuant to instructions from Steven Engel ("Engel"), McGraw's Vice President of Finance (M. Resp. ¶8). Saunders had no authority to determine personally whether any sales representative was entitled to be paid – instead prior approval from Engel and another senior analyst was required for any payment (id.). Saunders has admitted that

she made a mistake in calculating Kelly's sample charges from 2006 (id. ¶13).  Hence McGraw

owed Kelly $29,843.30 in reimbursement for 2006 expenses as of March 8, 2012, and McGraw

then wired that amount into Kelly's checking account -- without interest and nearly two years

after Kelly filed this action to recover that sum among other things (id.; K. St. ¶13 n.5).

In 2007 Kelly again incurred expenses in excess of his $60,000 sample allowance (K. St.

¶4).  With Kelly's knowledge, McGraw charged back approximately $70,000 in excess expenses

against his earned commissions (M. St. ¶39).  At the end of 2007 there was still a balance of

excess expenses incurred by Kelly but not yet charged back against his earned commissions (id.

¶40; K. Resp. ¶40).  On March 10, 2008 Kelly and McGraw entered into the Chargeback

Agreement, which read (K. St. ¶7):

> To confirm our previous discussions, as part of Shawn Kelly's two-year
> independent sales representative agreement, starting January 1, 2008, Wright
> Group/McGraw-Hill, agrees to waive Shawn Kelly's cost of product
> implementation, pilots, samples, and shipping from 2007.  Any balances owed by
> Shawn Kelly to Wright Group/McGraw Hill from 2007 will be netted to zero.

Saunders testified that Kelly would have been owed approximately $70,000 in commissions from

2007 if his sample charges from that entire year were waived (id. ¶9).

In March 2008 Kelly and McGraw entered into the 2008 Sales Agreement, running from

January 1, 2008 to December 31, 2009 and pursuant to which Kelly would market and sell

certain educational materials published by McGraw in California and Nevada (M. St. ¶¶12, 18;

K. St. ¶19).  No amendments or extensions could be made except by further written agreement

(M. St. ¶22).  Paragraph 4.1 of the 2008 Sales Agreement provided that commissions were to be

based on sales and that a sale has occurred "if [McGraw] ships directly and issues a bill for the

Product, during the term of this Agreement" (id. ¶20).

Before the 2008 Sales Agreement was signed, Kelly had made a written offer to Bodie Marx ("Marx"), a Senior Vice President and National Sales Manager at McGraw, to waive commissions on 2009 reorders or "residual" business in California in exchange for a 15% commission rate on new sales and McGraw's agreement to cover certain costs such as shipping (Kelly 6/29/11 Dep. Ex. 52). Marx had countered in a February 18, 2008 email with an offer of an 8% commission for the first $4 million in California sales and a 12.5% commission on "all sales over $4M (retroactive to dollar one)" (Marx 9/8/11 Dep. Ex. 2). That response did not distinguish between new and residual business (id.). On February 21, 2008 Marx forwarded his February 18 email to other McGraw employees and stated "[Kelly] has agreed to the terms below," again making no mention of any difference between new and residual business (id.).

Engel thereafter directed Saunders not to pay Kelly commissions on 2009 reorders (M. Resp. ¶14). Kelly's employee Frank Sokolowski testified that Kelly told him McGraw would not pay commissions on reorders (id.). During 2009 there were 187 California schools that placed reorders aggregating $1,378,905.60 (K. St. ¶17), and Kelly was not paid a commission on any of those sales (id. ¶18).

Unsurprisingly, whether or not the parties agreed that Kelly would waive commissions on 2009 reorders is hotly contested. Kelly testified, but McGraw denies, that Marx told him in early 2009 that Kelly would be paid a commission if he made a 2009 sale even where the materials were to be shipped and the customer was to be billed in 2010, after the term of the 2008 Sales Agreement had ended (Kelly 6/29/11 Dep. 163-64). Relatedly, Kelly also testified that Marx told him he would receive a commission if a school signed a letter of intention, during the term of the Agreement, to purchase Everyday Math products in 2010. But nothing of that sort happened –

Kelly did not obtain from any school district a written commitment to order Everyday Math in 2010 that would entitle him to a commission under the preceding sentence's standard that he ascribes to Marx (Kelly 6/29/11 Dep. 172-74, 209).

During the summer of 2009 McGraw manager Kim Bernard ("Bernard") told Kelly that McGraw intended to extend Kelly's contract into 2010 (K. St. ¶24). Marx also told Kelly that he intended to extend Kelly's contract (id. ¶25). McGraw responds that neither Bernard nor Marx had authority to renew or extend Kelly's contract into 2010 – instead that decision had to be made by McGraw's Senior Vice President of Sales Tom Bruce ("Bruce") (M. Resp. ¶¶24-26).

Despite the assurances to Kelly described in the preceding paragraph, Kelly Keating ("Keating"), McGraw's sales manager for northern California, testified that at least by July 17, 2009 it was clear that he and other direct sales managers would be taking over sales responsibility for Everyday Math in California and that Kelly's contract would not be extended into 2010 (K. St. ¶37). On September 28, 2009 Keating received an image of McGraw's website via email that listed Scott Baucher ("Baucher") as McGraw's representative for Everyday Math (id. ¶38). Baucher informed Keating at that time that he was already fielding calls for Everyday Math (id.). Kelly repeatedly asked McGraw about the renewal of his contract and was told that a decision had yet to be made (id. ¶26). He was aware that any contract renewal or extension had to be in writing (M. Resp. ¶26).

Frank Valenti ("Valenti") was employed by McGraw from May 2001 through July 2010, becoming a full-time in-house sales representative in 2002 (K. St. ¶27). Valenti testified that he was involved in promoting the Everyday Math series to California school districts as of July 2009 (Valenti 5/23/11 Dep. 96) and was trained in selling Everyday Math during a national sales

meeting in August 2009 (K. St. ¶28). Shortly after that meeting Valenti's boss, Bernard, told him to "stay away from the topic of Shawn Kelly," that the situation with Kelly was "sensitive" and that Valenti should "not get involved with calling Shawn Kelly" (id. ¶29-30).

Kelly testified that in 2009 Valenti misrepresented himself to California school districts as the McGraw representative for Everyday Math (Kelly 6/29/11 Dep. 102-04). Similarly, on October 14, 2009 Lynn Cevellos, a McGraw employee, told a California school representative that Valenti was its sales representative (K. St. ¶34). But it will be recalled that Kelly was in fact the assigned McGraw representative for California during the terms of the 2006 and 2008 Sales Agreements (K. St. ¶27). Although on October 20, 2009 one of McGraw's managers (not a top-level executive) sent an e-mail directed to "a long list of recipients" (including Valenti), the sixth paragraph of which said that Everyday Math leads should go directly to Kelly and Burch, his sales associate (Valenti 5/23/11 Dep. 90-91), Valenti also testified that he and other in-house McGraw employees had already taken over Everyday Math in approximately June 2009 and that he was calling on California school districts to sell Everyday Math in September 2009 (Valenti 11/4/11 Dep. 153-54; K. St. ¶33). Valenti never so informed Kelly because Bernard had instructed him not to speak to Kelly (id. ¶32).

If the outcome here were to be driven by the level of McGraw's business morality (or lack of it), what the recital to this point portrays would put it in substantial jeopardy.[5] But the problem for Kelly is that to prevail on any of his theories of recovery he must prove that McGraw's troubling conduct caused him some damage – and as to most of those theories

---

[5] As already stated, for purposes of this opinion Kelly's version of any disputed events must be credited.

recovery is precluded by the total lack of evidence that Valenti or any other salesperson siphoned off any orders during 2009 that would otherwise have generated commissions to Kelly in that year, or that any prospective sales during the term of the 2008 Sale Agreement were diverted to a time after that agreement ran out.

Thus in responding to an interrogatory asking that he identify the amount of damages he seeks to recover under each count, Kelly referred to amounts for allegedly unpaid commissions and unreimbursed expenses but went on to state that "[t]o calculate plaintiff's damages for defendant's other breaches of the parties' contract, including competing against him in his own territory, plaintiff anticipates relying upon expert testimony" (M. St. Ex. E 4-5). Kelly's counsel later informed this Court that he would not call any such witness at trial (K. Resp. ¶38). With discovery having been closed, Kelly has not identified any damages he suffered by virtue of McGraw's alleged "other breaches of the parties' contract."

All of this, then, provides the backdrop against which this opinion must analyze Kelly's positions challenged by the present motion. This Court turns to that task.

**Fraud**

Kelly withdrew his fraud claim (Count V) in response to the current motion, stating that his "contractual and statutory remedies are sufficient with respect to [McGraw's] conduct in inducing him to market the deferred payment plans" (K. Mem. 1). McGraw argues that an express abandonment of a claim at this stage of the proceedings should result, at a minimum, in a dismissal with prejudice or grant of summary judgment (another example of the misconceptions described in n.1) and that this Court should also consider sanctioning Kelly by awarding attorneys' fees incurred in litigating his fraud claim, which McGraw sought to dismiss at the

9

outset of the case. But any such motion for sanctions must be brought formally so that Kelly has a chance to respond. Meanwhile McGraw's motion for the dismissal of Kelly's Count V assertions of fraud is granted.

## Unjust Enrichment

Kelly also withdrew his Count VII unjust enrichment assertion pertaining to the 2008 Sales Agreement after conceding that the existence of that Agreement is uncontested, which precludes a finding of unjust enrichment as a matter of law (People ex rel. Hartigan v. E & E Hauling, Inc., 153 Ill.2d 473, 497, 607 N.E.2d 165, 177 (1992)). Dismissal is also granted as to that theory of recovery. Although neither party discussed Kelly's contentions of unjust enrichment as to the Chargeback Agreement (Count X), both parties agree as well as to the existence of that Agreement, and thus to its preclusive effect on any potential claim of unjust enrichment. Hence the same ruling applies to Count X.

## Breach of the 2008 Sales Agreement

To the extent that Kelly claims McGraw breached the 2008 Sales Agreement by improperly interfering with Kelly's marketing efforts or competing with Kelly for business within his territory as set forth in Complaint ¶29, he has failed to state any damages and does not argue that he experienced any such damages in his memorandum. Because proof of damages is a required element of a breach of contract claim under Illinois law (Henderson-Smith & Assocs., Inc. v. Nahamani Family Serv. Ctr., Inc. , 323 Ill. App. 3d 15, 27, 752 N.E.2d 33, 43 (1st Dist. 2001)), Kelly's contention that McGraw breached the contract through interference is likewise dismissed.

**Expense Reimbursement**

Under the Chargeback Agreement, McGraw agreed "to waive Shawn Kelly's cost of product implementation, pilots, samples, and shipping from 2007. Any balances owed by Shawn Kelly to [McGraw] from 2007 will be netted to zero" (K. St. ¶7). McGraw treats the second sentence as a clarification of the waiver proposed in the first, which it reads as a commitment to waive those costs from 2007 that remained outstanding as of the date the parties entered into the Chargeback Agreement. On the other hand, Kelly argues that the first sentence is controlling. Because it does not distinguish between currently outstanding and already charged costs, Kelly seeks reimbursement of the $70,000 that McGraw had earlier charged against his commissions in 2007.

Nationwide Mut. Fire Ins. Co. v. T & M Master Builders & Renovations, 2011 Ill. App. 2d 101143, 959 N.E.2d 201, 209 (2d Dist. 2011) has recently reconfirmed the conventional wisdom as to one facet of contract interpretation:

> It is well established that, where an inconsistency exists in a contract, a more specific provision controls over a more general one.

In addition, courts may not interpret contracts in such a way that provisions would be nullified or rendered meaningless (Hot Light Brands, LLC v. Harris Realty Inc., 392 Ill. App. 3d 493, 499, 912 N.E.2d 258, 263 (2d Dist. 2009)).

Here Kelly's contractual reading is flawed in two separate respects under those principles: First, he contends the more general first sentence controls over the more specific second sentence – a position at odds with the caselaw exemplified by Nationwide. Second, if Kelly were correct

that the first sentence was intended to waive <u>all</u> 2007 costs, both currently outstanding and already charged, the second sentence would be rendered superfluous.

But importantly, there is more reason to reject Kelly's position than mere reliance on formulaic principles of contract construction. To buttress the just-stated conclusion in those respects, note that the first sentence of the Chargeback Agreement begins with "To confirm our previous discussions ..." – and Kelly has not contended that either side spoke of the already-charged costs in those discussions.

Thus the conclusion that those earlier costs were <u>not</u> within the scope of the waiver is further fortified by the lack of evidence referred to in the preceding sentence. In sum, Kelly's contention as to that aspect of the Chargeback Agreement is rejected.

**Exemplary Damages under the Sales Act**

Kelly alleges in Count III that McGraw violated the Sales Act by failing to timely pay commissions "for sales of [McGraw's] publications for which [Kelly] was the procuring cause, even if such sales were completed after the term of the [2008 Sales Agreement]" – a contention that includes commissions both (1) for school board adoptions of textbooks during 2008 and 2009 that did not become billable sales until 2010 and (2) for reorders placed after 2009 (Complaint ¶33). This Court has already dismissed Kelly's Count II breach of contract argument based on the procuring cause doctrine, finding that the 2008 Sales Agreement defined sales for the purpose of commission payments as those where McGraw both shipped the product and billed the customer during the term of the Agreement. Although Kelly testified that Marx told him orally that he would be paid a commission for sales shipped after 2009, the 2008 Sales

Agreement was subject to modification only by further written agreement, and no such agreement

exists (Kelly 6/29/11 Dep. 163-64; M. St. ¶22).

To the extent then that Kelly seeks exemplary damages based on McGraw's nonpayment

of commissions on orders that were placed, shipped and paid after expiration of the term of the

2008 Sales Agreement, he loses. That leaves for consideration only those commissions allegedly

due on reorders placed and billed in 2009 but paid for sometime thereafter.

Under the Sales Act (820 ILCS 120/3):

> A principal who fails to comply with the provisions of Section 2 concerning
> timely payment or with any contractual provision concerning timely payment due
> upon the termination of the contract with the sales representative, shall be liable in
> a civil action for exemplary damages in an amount which does not exceed 3 times
> the amount of the commissions owed to the sales representative.

Although the use of "shall be liable" might ordinarily call for a mandatory award of exemplary

damages, more than 15 years ago Gramercy Mills, Inc. v. Wolens, 63 F.3d 569, 573 (7th Cir.

1995) relied on Illinois caselaw to hold that such exemplary damages should be awarded under

the Sales Act "only when the sales representative proves that the principal willfully and wantonly

refused to pay" – to "punish and deter intentional or egregious conduct." And more recently such

Illinois cases as Maher & Assocs., Inc. v. Quality Cabinets, 267 Ill. App. 3d 69, 80, 640 N.E.2d

1000, 1008 (2d Dist. 1994) (internal quotation marks omitted) have reconfirmed that exemplary

damages require "a finding of culpability that exceeds bad faith" and "may be awarded only for

conduct involving an element of outrage similar to that normally found in crime" (id. at 81).

McGraw argues that Kelly cannot demonstrate that its alleged failure to pay commissions

meets such demanding standards, so he is not entitled to exemplary damages under the Sales Act.

McGraw further disputes the propriety of Kelly's reliance upon conduct that McGraw argues is

"unrelated to the non-payment of commissions," such as McGraw's admitted failure to reimburse

nearly $30,000 in expenses from 2006, its failure to pay commissions that Kelly earned from

August to December 2007 and its alleged delay in informing Kelly that his contract would not be

renewed in 2010 (M. R. Mem. 11; K. Mem. 12).

To support its argument as to a lack of "relatedness," McGraw points to the statement in

State Farm Mut. Auto Ins. Co. v. Campbell, 538 U.S. 408, 422 (2003) that a "defendant's

dissimilar acts, independent from the acts upon which liability was premised, may not serve as

the basis for punitive damages." Two reasons undercut such attempted reliance, however.

For one thing, the United States Supreme Court's position at the top of the judicial heap

does not extend to federal cases grounded in diversity jurisdiction, where Erie v. Tompkins

teaches that a state's substantive law controls – and McGraw has not addressed Illinois state law

cases for the proposition it advances. But leaving that aside, the situation in State Farm differed

sharply from the circumstances here, where Kelly portrays what McGraw labels as "dissimilar"

acts as part of a pattern of its withholding funds due to him (K. Mem. 12). Because Kelly's

version must be credited at this stage and because the withholding of commissions is the basis of

Kelly's claim for exemplary damages, the prior events to which he points may be considered in

determining whether McGraw's conduct was sufficiently "outrageous" as a matter of law.[6]

_____

[6] Kelly argues that a trial is necessary to determine whether McGraw's conduct rises (or
more precisely falls) to the level of outrageousness. Not so. As Kempner Mobile Elec., Inc. v.
Southwestern Bell Mobile Sys., 428 F.3d 706, 714 (7th Cir. 2005) states:

> Under Illinois law, while the measurement of punitive damages is a jury question,
> the preliminary question whether the facts of a particular case justify the
> imposition of punitive damages is properly one of law

(continued...)

14

Clearly McGraw's conduct toward Kelly left a good deal to be desired. For example, although of course it had no obligation to renew the contractual relationship between them, no real excuse appears to justify its dissembling as it did by its higher-ups' express plan to keep him out of the loop.[7] About the only explanation that occurs to this Court for the assurances of renewal by Marx (who was, remember, McGraw's Senior Vice President and National Sales Manager) and by Bernard – the latter totally at odds with her instructions to Valenti described in the prior footnote – is a desire to keep Kelly working hard at promoting McGraw's products for the future, knowing – as Kelly did not – that McGraw and not Kelly would reap the fruits of his labor.

As for McGraw's admitted failure to reimburse Kelly for $30,000 in expenses incurred in 2006, Saunders testified (1) that she made an honest mistake in calculating Kelly's 2006 sample charges by issuing a $50,000 credit towards his total sample charges instead of issuing a commission check per McGraw's agreement with Kelly and (2) that she did not realize her mistake until years later (M. Resp. ¶13). Even if that account is credited, McGraw did not wire the remaining $30,000 into Kelly's account (and without interest at that) until long after it had to know about the error – not until March 2012 (id.), after Saunders' deposition had been taken in this lawsuit. Once again the most favorable label that would appear to be attached to McGraw's conduct is that it was shabby indeed.

---

[6](...continued)
Although that language is generic in nature, neither side has offered any caselaw identifying a different standard under the Sales Act.

[7] Note the instructions from Valenti's boss Bernard shortly after the August 2009 national sales meeting, to "stay away from the topic of Shawn Kelly," describing the situation with Kelly as "sensitive." "Sensitive" in what way? Is there any real-world sense of that locution other than reflecting a desire to hide the truth from Kelly?

Under ordinary circumstances the decision as to the consequences of such actions would be grist for the mill of a factfinding jury. But as n.7 reflects, Illinois law treats the issue as one of law for resolution by the court. And given the extremely high level of culpability demanded by Illinois caselaw (recall <u>Maher's</u> reconfirmation of those tough standards), this Court cannot find McGraw to have crossed the border into that forbidden territory.

With reluctance, then, this Court also dismisses the Count III effort to obtain exemplary damages. And even though McGraw's motion did not specifically target the comparable contention under Count IX, the analysis here dooms that as well.

**Conclusion**

For the reasons stated at length in this opinion, McGraw's motion for partial summary judgment is denied as ill-considered. Instead each of Kelly's theories of recovery challenged by McGraw's motion is dismissed. Both sides' counsel are ordered to appear for a status hearing at 8:45 a.m. June 15, 2012 to discuss both the substance and the procedure to be followed in connection with Kelly's surviving contentions.

 

_____
Milton I. Shadur
Senior United States District Judge

Date: June 5, 2012